# EXHIBIT 6

**DAG/CJB**

FILED IN OPEN COURT

'APR 28 2016

CHARLES R. DIARD, JR.
CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIM. NO. 15-00088-CG** |
| | * | **USAO NO. 13R00521** |
| **v.** | * | |
| | * | **VIOLATIONS: 18 USC § 1962(d)** |
| **JOHN PATRICK COUCH, M.D. and** | * | **21 USC § 846** |
| **XIULU RUAN, M.D.** | * | **21 USC § 841(a)(1)** |
| | * | **18 USC § 1349** |
| | * | **18 USC § 371** |
| | * | **18 USC § 1956(h)** |
| | * | **18 USC § 1957** |
| | * | **Forfeiture Notices** |

## SECOND SUPERSEDING INDICTMENT

**THE GRAND JURY CHARGES:**

**I.     INTRODUCTION**

At all times relevant to this Second Superseding Indictment:

### THE DEFENDANTS

1.      Defendant **JOHN PATRICK COUCH, M.D.** was a Mobile, Alabama physician with a medical degree from the Medical College of Georgia.  He was licensed to practice medicine in the State of Alabama, and obtained a Drug Enforcement Administration (hereinafter "DEA") Registration Number which allowed him to dispense Controlled Substances.

2.      Defendant **XIULU RUAN, M.D.** was a Mobile, Alabama physician with a medical degree from Shandong Medical University, located in Jinan, China.  He was licensed to practice medicine in the State of Alabama, and obtained a DEA Registration Number which allowed him to dispense Controlled Substances.

### PAIN CLINIC AND PHARMACY

3.      Together, **COUCH** and **RUAN** owned and co-directed a pain management clinic

named Physician's Pain Specialists of Alabama, P.C. (hereinafter "PPSA"). PPSA had two clinic locations in Mobile, Alabama — one located at 2001 Springhill Avenue, and the other located at 4682 Airport Boulevard. **COUCH** was listed as the registered agent for PPSA.

    4.    **COUCH** and **RUAN** also co-owned a pharmacy named C&R Pharmacy, which was located adjacent to the PPSA clinic on Airport Boulevard in Mobile, Alabama. **COUCH** was the registered agent for C&R Pharmacy.

### APPLICABLE FEDERAL LAW

    5.    The Controlled Substances Act (hereinafter "CSA") governs the distribution and dispensing of various listed drugs, including narcotics, that are prescribed by physicians and other licensed health care providers. Licensed physicians and physician extenders may distribute and dispense Controlled Substances if they have a DEA Registration number and if they comply with all DEA regulations and all applicable federal laws.

    6.    The CSA assigns legal authority for the regulation of Controlled Substances to the DEA. The statute charges DEA with the prevention, detection, and investigation of the diversion of Controlled Substances from legitimate channels while at the same time ensuring that adequate supplies are available to meet legitimate domestic medical, scientific and industrial needs.

    7.    The DEA issues registration numbers to qualifying persons, who are authorized to dispense Controlled Substances. To issue a prescription for a Controlled Substance, a physician must be licensed to practice by a state authority and must have a DEA registration number.

    8.    Under Title 21, United States Code, Section 802(21) the term practitioner is defined as a "physician . . . registered, or otherwise permitted by the United States or the jurisdiction in which the he practices . . . to distribute, dispense, . . . administer, . . . a Controlled Substance in the course of professional practice . . . " Under Title 21, United States Code,

Section 822(a)(2), every person or entity who handles Controlled Substances must be registered with DEA or be exempt by regulation from registration. The DEA registration grants practitioners federal authority to handle Controlled Substances. However, the DEA registered practitioner may only engage in those activities that are authorized under state law for the jurisdiction in which the practice is located.

9.     The practitioner is responsible for the proper prescribing and dispensing of Controlled Substances prescribed under his or her name. The practitioner is responsible for ensuring that the prescription conforms to all requirements of the law and regulations, both federal and state. Controlled Substances may only be distributed or dispensed lawfully in the manner prescribed by the mechanism created by the CSA.

10.     Provisions of the CSA mandate that the person or entity registered with DEA must be able to account for all Controlled Substances which have been received, distributed, dispensed, or disposed.

11.     Title 21, Code of Federal Regulations, Sections 1306.05, 1306.11, and 1306.21 require a prescription for a Controlled Substance to be dated as of, and signed on, the day issued, bearing the patient's full name and address, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address, and DEA registration number of the prescriber.

## CONTROLLED SUBSTANCES

12.     Defendants **COUCH** and **RUAN** each obtained DEA Registration Numbers, which allowed them to dispense Controlled Substances. Between January 1, 2011 and May 20, 2015, **COUCH** and **RUAN** wrote approximately 285,000 prescriptions for Controlled Substances.

13.     The CSA, Title 21, United States Code, Section 801, *et seq.*, and its implementing regulations set forth which drugs and other substances are defined by law as "Controlled Substances." Those Controlled Substances are then assigned to one of five schedules — Schedule I, II, III, IV, or V — depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

14.     The term "Schedule I" means the drug has no currently-accepted medical use and lacks safety under medical supervision. Schedule I substances cannot legally be prescribed.

15.     The term "Schedule II" means the drug or other substance has a high potential for abuse, the drug has a currently accepted medical use with severe restrictions, and abuse of the drug or other substances may lead to severe psychological or physical dependence. Certain Schedule II drugs have a high potential for abuse. This abuse can lead to addiction, overdose, and sometimes death.

16.     The term "Schedule III" means the drug or other substance has a high potential for abuse, but less than the drugs listed in Schedule II, the drug has a currently accepted medical use with severe restrictions, and abuse of the drug or other substances may lead to severe psychological or physical dependence.

17.     The term "Schedule IV" means the drug or other substance has a low potential for abuse relative to the drugs or other substances in Schedule III, the drug or other substance has a currently accepted medical use in treatment, and abuse may lead to limited (relative to the drugs or substances in Schedule III) physical or psychological dependence.

18.     Title 21, Code of Federal Regulations, Section 1306.04(a) state that a valid prescription for a Controlled Substance must be issued for a legitimate medical purpose by an

4

individual practitioner acting in the usual course of his professional practice. An Order purporting to be a prescription issued not in the usual course of professional practice, or in legitimate and authorized research, is not a prescription within the meaning and intent of Section 309 of the Act (21 U.S.C. § 829). The person knowingly issuing it shall be subject to the penalties provided for violations of the provisions of law relating to Controlled Substances.

19. Certified Automation of Reports and Consolidated Orders System (hereinafter "ARCOS") is an automated, comprehensive drug reporting system maintained by DEA, which monitors the flow of Controlled Substances from their point of manufacture through commercial distribution channels to point of sale or distribution at the dispensing/retail level. ARCOS accumulates these transactions, which are then summarized into reports. These DEA reports give investigators in Federal and state government agencies information that can then be used to identify the diversion of Controlled Substances into illicit channels of distribution.

20. **COUCH** and **RUAN** regularly prescribed large quantities of the following Controlled Substances at PPSA:

A. **Oxycodone**: The generic name for a highly addictive prescription analgesic. The use of oxycodone in any form can lead to physical and/or psychological dependence, and abuse of the drug may result in addiction. It is classified as a Schedule II Controlled Substance, and is sold generically or under a variety of brand names, including OxyContin, Roxicodone, Percocet, and Endocet.

B. **Oxymorphone:** The generic name for a highly addictive prescription analgesic. The use of oxymorphone in any form can lead to physical and/or psychological dependence, and abuse of this drug may result in addiction. It is classified as a Schedule II Controlled Substance, and is sold generically or under a variety of brand names, including Opana.

C.     **Hydrocodone**: The generic name for a highly addictive prescription analgesic. The use of hydrocodone in any form can lead to physical and/or psychological dependence, and abuse of this drug may result in addiction.  As of October 6, 2014, hydrocodone is classified as a Schedule II Controlled Substance.  Prior to this date, it was classified a Schedule III Controlled Substance  It is sold generically or under a variety of brand names, including Lortab, Norco, Zohydro, and Vicodin.

D.     **Hydromorphone:** The generic name for a highly addictive prescription analgesic. The use of hydromorphone in any form can lead to physical and/or psychological dependence, and abuse of this drug may result in addition.  It is classified as a Schedule II Controlled Substance, and is sold generically or under a variety of brand names, including Exalgo and Dilaudid.

E.     **Fentanyl**: The generic name for a highly addictive prescription analgesic.  The use of fentanyl in any form can lead to physical and/or psychological dependence, and abuse of this drug may result in addiction.  It is classified as a Schedule II Controlled Substance.  It is sold generically or under a variety of brand names, including Subsys, Abstral, Lazanda, Fentora, and Duragesic.

F.     **Morphine**: The generic name for a highly addictive prescription analgesic.  The use of morphine in any form can lead to physical and/or psychological dependence, and abuse of this drug may result in addiction.  It is classified as a Schedule II Controlled Substance.  It is sold generically or under a variety of brand names, including Avinza, MsContin, and Kadian.

G.     **Benzodiazepines:** The generic name for an addictive class of psychoactive drugs that are used to treat a variety of medical issue, including depression, panic disorders, anxiety disorders, and insomnia, among others.  The use of benzodiazepines can lead to physical and/or

psychological dependence, and abuse of these drugs may result in addiction. The benzodiazepine class of drugs is classified as Schedule IV Controlled Substances. Common brand names of benzodiazepines include Xanax (generic: alprazolam); Valium (generic: diazepam); and Klonopin (generic: clonazepam), among many others.

      H.    **Carisoprodol:** The generic name for a centrally acting skeletal muscle relaxant. Carisoprodol is classified as a Schedule IV Controlled Substance. It is sold generically or under the brand name Soma.

      21.    Beginning in 2013, **RUAN** became not only one of the most prolific purchasers of Controlled Substances in the State of Alabama, but also in the entire United States. He regularly out-purchased doctors in much larger cities in the United States.

      22.    In the State of Alabama, **RUAN** was the number one purchaser of both oxycodone and morphine in 2011, 2012, 2013, 2014, and 2015. **RUAN** was also the top purchaser of fentanyl in the State of Alabama in 2012, 2013, and 2014.

      23.    The amount of Controlled Substances purchased by **RUAN** was not only extremely high as compared to other doctors within the State of Alabama, but also as compared to doctors throughout the United States.

      24.    In 2013 and 2014, **RUAN** ranked amongst the top purchasers of oxycodone, morphine, hydrocodone, and fentanyl in the entire United States.

      25.    In 2015, **RUAN** only purchased controlled substances for five months before his arrest on May 20, 2015. However, even when compared to other doctors nationwide who purchased drugs over twelve months in 2015, **RUAN** was still nationally ranked in morphine, oxycodone, and fentanyl.

      26.    Many of the prescriptions issued by defendants **RUAN** and **COUCH** were not

issued for a legitimate medical purpose and were not issued within the usual course of professional medical practice.

### PAIN MANAGEMENT

27.     The discipline of pain medicine is a recognized medical sub-specialty practiced by physicians in the United States.  Legitimate pain medicine experts have specialized knowledge, education, training, and experience and utilize a multi-disciplinary approach.

28.     Despite some aspects of legitimate medical practice at PPSA, **RUAN** and **COUCH** ran what was, in essence, a pill mill.  Their primary method of pain management was writing multiple prescriptions for high doses of Schedule II, III, and IV Controlled Substances, including, but not limited to: oxycodone (brand names: OxyContin, Roxicodone, Percocet, and Endocet), oxymorphone (brand name: Opana), hydrocodone (brand names: Lortab, Norco, Zohydro, and Vicodin) hydromorphone (brand names: Exalgo and Dilaudid), fentanyl (brand names: Subsys, Abstral, Lazanda, Fentora, and Duragesic), and morphine (brand names: MsContin, Avinza, and Kadian).  Some of these prescriptions were diverted and/or abused by drug traffickers and addicts.

### TIRF DRUGS

29.     Transmucosal instant-release fentanyl ("TIRF") drugs are a subset of other fentanyl-based drugs.  TIRF drugs are sold under several brand names, including Subsys, Abstral, Fentora, and Lazanda, all of which are Schedule II Controlled Substances.

30.     The primary difference between these brands is how the fentanyl is delivered to the patient:  Subsys is an oral spray; Abstral is a dissolvable tablet placed under the tongue; Fentora is a buccal tablet placed in the cheek; and Lazanda is a nasal spray.

31.     The only FDA-approved indication for TIRF drugs is "for the management of

8

breakthrough pain in patients with cancer who are already receiving, and who are tolerant to, around-the-clock opioid therapy for their persistent pain."

32.     Since fentanyl is approximately 100 times more potent than morphine, and 40–60 times more potent than 100% pure heroin, fentanyl in TIRF drugs is measured in micrograms.

33.     Due to the extreme risk of misuse, abuse, addiction, and overdose death associated with TIRF drugs, the FDA requires that all practitioners, pharmacists, and patients must be enrolled in an FDA Risk Evaluation & Management Strategy ("REMS") program before they are allowed to prescribe, dispense, or take Subsys, Abstral, Fentora, or Lazanda.

34.     Before prescribing a TIRF drug to a patient, the prescriber must fill out and sign a REMS form which explicitly states, "I understand that TIRF medicines are indicated only for the management of breakthrough pain in patients with cancer who are already receiving, and who are tolerant to, around-the-clock opioid therapy for their underlying persistent pain."

35.     TIRF drugs are exceptionally expensive.  Insurance providers for PPSA patients who were prescribed TIRF drugs were billed anywhere from just under $1,000.00 per month for a patient prescribed 30 doses of Subsys 100mcg, all the way up to over $21,000.00 per month for a patient prescribed 240 doses of Subsys 1,200mcg.

36.     Due to both the exceptional danger and expense of TIRF drugs, many insurance providers required prior approval before they reimbursed for a TIRF prescription.

37.     Between January 2011 and May 20, 2015, **COUCH** and **RUAN** wrote over 6,000 prescriptions for TIRF drugs to approximately 1,000 different PPSA patients.  Virtually all of these patients filled their expensive TIRF drug prescriptions at C&R Pharmacy, which was owned by **COUCH** and **RUAN**.

38.     Of the approximately 1,000 different PPSA patients prescribed TIRF drugs by

RUAN and COUCH, only a small percentage actually had cancer.

**BILLING REQUIREMENTS**

39.     A National Provider Identifier ("NPI") is a unique billing number assigned to physicians, as well as to physician extenders, who have the capability of billing for patient services.   The unique NPI under which a bill is submitted is a critical component used by healthcare insurance providers to determine whether a particular patient service will be reimbursed, and if so, for how much.   Physicians are typically reimbursed at a higher rate than physician extenders.

40.     Defendants COUCH and RUAN both had their own unique NPIs.   They also employed physician extenders, such as physician's assistants ("PA"), certified registered nurse practitioners ("CRNP"), and certified registered nurse anesthetists ("CRNA") at PPSA.   Some of the physician extenders at PPSA also had their own unique NPIs.

41.     One of the insurance companies billed by PPSA, Blue Cross/Blue Shield of Alabama ("BC/BS"), required claims to be billed under the name and NPI of the physician or physician extender who actually rendered the service.   The BC/BS billing guidelines stated,

> "Under no circumstances should services performed solely by a [physician extender] be billed under a physician's name and NPI.   However, a physician may bill for these services under his/her name and NPI if the physician also sees and renders services to the patient, reviews the notes of the physician extender, and concur with the findings."

42.     These guidelines are in place, because BC/BS typically reimbursed at a higher rate for services provided by a physician, as opposed to the same services provided by a physician extender.

43.     BC/BS, Cigna, United Healthcare, Tri-Care, and Medicare, among other insurance companies who provide healthcare coverage, are all "healthcare benefits programs" as

that term is defined in Title 18, United States Code, Section 24(b).

<strong><u>UNDERCOVER ACTIVITY</u></strong>

44.     Between August 2014 and January 2015, a DEA Task Force Officer ("TFO") acted in an undercover capacity (hereinafter "UC") as a "patient" seeking Controlled Substances. Specifically:

45.     On or about August 5, 2014, the UC had an initial "patient" visit with **COUCH** at the PPSA Springhill location in Mobile, Alabama.  During this initial visit, the UC told a co-conspirator employee that he had previously been self-medicating with oxycodone and Lortab he purchased on the street.  Thereafter, during this same office visit, the UC saw **COUCH** for approximately 43 seconds and received a prescription for 90 tablets of Roxicodone 15mg, a Scheduled II Controlled Substance.  The prescription was signed by **COUCH**.

46.     On or about September 8, 2014, the UC, who was scheduled to have an appointment with **COUCH**, was seen instead by a co-conspirator employee at the Springhill PPSA location in Mobile, Alabama.  This employee was not a medical doctor and was not authorized to prescribe or dispense Controlled Substances.  During this visit, the UC was provided a prescription for 90 tablets of Roxicodone 15mg, a Schedule II Controlled Substance. The prescription appeared to have been signed by **COUCH**.  The UC did not see, nor was he treated by, **COUCH** during this visit.

47.     On or about November 5, 2014, the UC, who was scheduled to have an appointment with **COUCH**, was seen instead by a co-conspirator employee at the Springhill PPSA location in Mobile, Alabama.  This employee was not a medical doctor and was not authorized to prescribe or dispense Controlled Substances.  During this visit, the UC's Roxicodone 15mg prescription, a Schedule II Controlled Substance, was increased to 110 tablets.

This prescription was pre-dated and appeared to have been signed by **COUCH**. In addition, the UC received a second, post-dated prescription for the same drug and quantity. The UC did not see, nor was he treated by, **COUCH** during this visit.

48. On or about January 29, 2015, the UC, who was scheduled to have an appointment with **COUCH**, was seen instead by a co-conspirator employee at the Springhill PPSA location in Mobile, Alabama. This employee was not a medical doctor and was not authorized to prescribe or dispense Controlled Substances. During this visit, the UC received a prescription for 110 tablets of Roxicodone 15mg, a Schedule II Controlled Substance, prior to any physical examination being performed. The prescription appeared to have been signed by **COUCH**. The UC did not see, nor was he treated by, **COUCH** during this visit.

### THE PPSA ENTERPRISE

49. The PPSA Enterprise, including its leadership, membership and associates, constituted an enterprise, as defined by Title 18, United States Code, Section 1961(4) (hereinafter "the PPSA Enterprise"), that is, a group of individuals and legal entities associated in fact. The PPSA Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the PPSA Enterprise. The PPSA Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

50. Members and associates of the PPSA Enterprise primarily operated the enterprise as a pill mill where numbers of prescriptions for Controlled Substances were written for no legitimate medical purpose or outside the usual course of professional practice. In addition, members and associates of the PPSA Enterprise engaged in medical billing fraud and other criminal violations.

51. Members of the PPSA Enterprise, including the Defendants **COUCH** and **RUAN**,

attempted to insulate themselves through the appearance of legitimate medical practice, which included the use of cursory physical exams, among other means and methods. Many of the prescriptions issued by the Defendants were illegal because they were not issued for a legitimate medical purpose, and not prescribed within the usual course of professional medical practice. The dispensing and distribution of Controlled Substances was undertaken primarily for a profit motive.

52.     Members of the PPSA Enterprise also engaged in wide-ranging criminal conduct.

## II.    CHARGES

### COUNT ONE

53.     The Grand Jury incorporates numbered paragraphs 1–52 of this Second Superseding Indictment as if fully set forth herein.

### THE PPSA ENTERPRISE

54.     Beginning at least in or about 2011 and continuing through or about May 20, 2015, the exact dates being unknown, in the Southern District of Alabama and elsewhere, defendants **JOHN PATRICK COUCH, M.D. and XIULU RUAN, M.D.**; entities PPSA and C&R Pharmacy; and other individuals known and unknown to the Grand Jury, constituted an Enterprise within the meaning of Title 18, United States Code, Section 1961(4), that is, a group of individuals and entities associated in fact. The PPSA Enterprise constituted an ongoing organization, the members and associates of which functioned as a continuing unit for a common purpose of achieving the objectives of the PPSA Enterprise.

### PURPOSES OF THE ENTERPRISE

55.     The purpose of the PPSA Enterprise included the following:

      A.     Providing the PPSA Enterprise and its leaders, members and associates with an expanding base of patients for narcotics distribution;

      B.     Generating, preserving and protecting the PPSA Enterprise's profits and patient base through acts of, among other things, unlawful drug distribution, healthcare fraud, and kickback violations;

      C.     Promoting and enhancing the PPSA Enterprise and its leaders, members and associates activities;

      D.     Enriching the leaders, members and associates of the PPSA Enterprise financially; and

      E.     Concealing and otherwise protecting the criminal activities of the PPSA Enterprise and its participants from detection and prosecution.

### MEANS AND METHODS OF THE ENTERPRISE

56.     The manner and methods of the PPSA Enterprise included, but were not limited to, the following:

57.     Defendants **COUCH** and **RUAN** co-owned and co-managed PPSA and C&R Pharmacy. Defendants **COUCH** and **RUAN** were aware that individuals would travel from numerous states to Alabama in order to illegally obtain Controlled Substances. Defendants **COUCH** and **RUAN** were aware that individuals requested prescriptions for large quantities of Schedule II, III, and IV Controlled Substances. Defendants **COUCH** and **RUAN** operated the PPSA pain management clinics in order to generate criminal proceeds through the illegal distribution and dispensing of Controlled Substances by means of prescriptions or orders without a legitimate medical purpose and outside the usual course of professional practice. Defendants **COUCH** and **RUAN** conspired to insulate the PPSA Enterprise members from criminal

prosecution by creating the appearance of a legitimate medical practice.

58.     The Defendants **RUAN** and **COUCH** frequently prescribed Controlled Substances based on their own financial interests, rather than the legitimate medical needs of the patient.  For example, **RUAN** and **COUCH** began prescribing tens of thousands of doses of the Schedule II Controlled Substance Abstral, a TIRF drug only approved by the FDA for breakthrough cancer pain, to non-cancer patients after **RUAN** and **COUCH** each purchased approximately $800,000.00 in stock of Galena Biopharma, Inc., the manufacturer of Abstral.  In addition, **RUAN** and **COUCH** would switch patients' prescriptions to drugs, including the Schedule II Controlled Substance Subsys, they were paid to promote, even if the patients' medical needs were being met with their current prescription.  Finally, at times, **RUAN** would determine a patient's prescription dose based on C&R Pharmacy's current inventory, as opposed to what a particular patient needed.

59.     The Defendants **RUAN** and **COUCH** established a pharmacy, C&R Pharmacy, in order to illegally distribute and dispense Controlled Substances to the individuals receiving prescriptions from the clinics.  Defendant **RUAN** also arranged for the dispensing of Controlled Substances directly from one PPSA clinic location to Workers Compensation patients in order to generate large criminal proceeds for himself and **COUCH**.

60.     Other co-conspirators, to include but not limited to Justin Palmer, who is not named as a defendant herein, would sign Defendant **COUCH'S** name on prescriptions and other documents in order to expedite the unlawful prescribing and dispensing of Controlled Substances for the PPSA Enterprise.

61.     The Defendants **RUAN** and **COUCH** would refrain from individualized and particularized treatment plans for a number of patients in order to expedite the illegal dispensing

of Controlled Substances. The Defendants understood that the majority of individuals seeking Controlled Substances would allege complaints of neck or back pain.

62.     Defendant **RUAN** and co-conspirators would typically require that a patient provide a urine sample every 60 to 90 days during the patient's visit at PPSA. These point-of-care urine drug screens (herein after "UDS") would be conducted in order to make the clinic and PPSA's activities appear to be proper and to ensure that the prescription of Controlled Substances appeared to be legitimate.

63.     **RUAN**, **COUCH** and co-conspirators did not routinely utilize the UDS analyses for their intended purpose, which was to determine whether a patient was taking the medications they had been prescribed and to ensure that the patients were not taking medications that they had not been prescribed. Rather, **RUAN** and **COUCH** used expensive gas chromatography-mass spectrometer (herein after "GC/MS") testing as a source of additional revenue for PPSA. These tests can be a legitimate part of the practice of pain management. However, **RUAN** and **COUCH** frequently ignored inconsistent GC/MS results, and continued prescribing large quantities of controlled substances to patients regardless of the GC/MS results.

64.     In addition, patient services performed by PPSA's physician extenders were fraudulently billed to healthcare benefits programs under the NPI of **COUCH**. This "up-coding" was done because healthcare providers typically paid more in reimbursement for office visits or procedures handled by the physician, as opposed to a physician extender, such as a nurse. The reimbursements for this "up-coding" of services resulted in PPSA and the doctors being paid more per visit by certain healthcare providers than they were entitled to be paid.

65.     The Defendants **RUAN** and **COUCH** compensated some of the employee co-conspirators, to include but not limited to Justin Palmer and Bridgette Parker, neither of whom

are named as defendants herein, based on the number of patients seen per day to induce the co-conspirators to see as many patients as possible each day, thereby, generating more money for the Enterprise.

66. The Defendants **RUAN** and **COUCH** and employee co-conspirators, to include but not limited to Justin Palmer and Bridgette Parker, neither of whom are named as defendants herein, would perform a cursory physical examination of the patients in order to insulate the co-conspirators, and in an attempt to justify the drugs being prescribed. The Defendants **RUAN** and **COUCH** and employee co-conspirators would examine individuals for the minimal amount of time possible in order to see the largest number of individuals each day and to generate the largest amount of criminal proceeds for the PPSA Enterprise.

67. **COUCH** and **RUAN** increased their profits by inducing Industrial Pharmacy Management ("IPM"), and later, Comprehensive RX Management ("CRM"), to pay them kickbacks in return for using their medical services, having threatened IPM & CRM with taking their business elsewhere. This inducement was accomplished by **RUAN** soliciting kickbacks for himself and **COUCH**. **RUAN** and **COUCH** increased their profits by receiving these kickbacks in exchange for dispensing Controlled Substances provided by IPM, and later CRM, to workers' compensation patients. Some of the patients were insured through federal healthcare programs. The defendants **RUAN** and **COUCH** were paid an agreed upon monthly amount from IPM, and subsequently from CRM, for dispensing the Controlled Substances. These monthly checks to **RUAN** and **COUCH** were delivered to them in the Southern District of Alabama by an interstate commercial carrier. Defendant **RUAN** requested that monthly kickback checks be made payable to one of his companies and be mailed to his residence in Mobile, Alabama rather than to the PPSA clinics.

17

68.     The defendant **RUAN** would verify, frequently by e-mail, with co-conspirator Christopher Manfuso, who worked for IPM and subsequently owned CRM, and who is not named as a defendant herein, which Controlled Substances resulted in higher reimbursables to PPSA and the defendants **RUAN** and **COUCH**.  Based on those conversations between **RUAN** and Manfuso, **RUAN** requested and ordered those Controlled Substances to be delivered to PPSA's dispensary at the PPSA Springhill Avenue location in Mobile, Alabama.

69.     Controlled Substances were delivered to the PPSA Springhill Avenue location in Mobile, Alabama, by a commercial interstate carrier, to include but not limited to FedEx, and the United States Postal Service.  Thereafter, Defendants **RUAN** and **COUCH** and other members of the conspiracy, would dispense the Controlled Substances based on the false representation that the Controlled Substances, with higher reimbursables, were the medications necessary to treat the Worker's Compensation patients.

70.     The agreement between these parties was that **RUAN** and **COUCH** would receive a guaranteed monthly payment and an additional percent of the profits generated by dispensing in house medications, to include Scheduled II and III, Controlled Substances, which had been provided them by IPM, and later, by CRM, to patients.

71.     The defendants **COUCH** and **RUAN** set up and maintained an online PPSA account with Blue Cross/Blue Shield ("BC/BS"), and other healthcare providers, so as to electronically submit medical claims and so as to be reimbursed electronically by BC/BS, and other healthcare providers.

72.     Specifically, as part of said conspiracy, members of the conspiracy, both known and unknown to the Grand Jury, fraudulently procured electronic payment from healthcare providers, to which they were not entitled.  The submission of bills to healthcare providers and

the payment from the healthcare providers caused interstate wire transmissions, to include e-mails, and electronic wire transfers, to be sent to and from the state of Alabama to places outside the state of Alabama, to include the Southern District of Alabama. Members of the conspiracy would also use or cause to be used commercial interstate carriers and the United States Postal Service, and would use or cause to be used interstate wire communications, that is e-mails and telephone calls, to be used for other purposes in furtherance of said scheme and artifice to defraud.

## THE CONSPIRACY

73.     During at least in or about 2011 and continuing thereafter through at least in or about May 20, 2015, the exact dates being unknown, in the Southern District of Alabama, Southern Division, and elsewhere, the defendants,

### JOHN PATRICK COUCH, M.D. and
### XIULU RUAN, M.D.,

being persons employed by and associated with the PPSA Enterprise, which PPSA Enterprise engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly, willfully and unlawfully combine, conspire, confederate, and agree, together and with each other, and with persons known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the PPSA Enterprise, through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and (5), consisting of:

## THE PATTERN OF RACKETEERING ACTIVITY

74.     The pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), through which the defendants and their co-conspirators agreed to conduct and participate in the conduct of the affairs of the PPSA Enterprise consisted of:

A.    Multiple offenses involving the felonious manufacturing, receiving, concealment, buying, selling or otherwise dealing in Controlled Substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; and

B.    Multiple acts indictable under Title 18, United States Code, Section 1343 (Relating to Wire Fraud) and  Title 18, United States Code, Section 1341 (Relating to Mail Fraud). ·

75.    It was part of the conspiracy that each Defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the PPSA Enterprise.

76.    All in violation of Title 18, United States Code, Section 1962(d).

## COUNT TWO

77.    The Grand Jury incorporates numbered paragraphs 1–52 of this Second Superseding Indictment as if fully set forth herein.

78.    Beginning during, or at least in, 2011, and continuing thereafter through May 20, 2015, in the Southern District of Alabama and elsewhere, the defendants,

**JOHN PATRICK COUCH, M.D. and
XIULU RUAN, M.D.,**

conspired with each other and with others, both known and unknown to the Grand Jury, to knowingly and unlawfully distribute and dispense, possess with intent to distribute and dispense, and cause to be distributed and dispensed, Schedule II Controlled Substances, including, but not limited to: oxycodone (brand names: OxyContin, Roxicodone, Percocet, and Endocet,), oxymorphone (brand name: Opana), hydromorphone (brand names: Exalgo and Dilaudid), and morphine (brand names: MsContin and Avinza), by means of prescriptions, among other means and methods, outside the usual course of professional medical practice and not for a legitimate medical purpose, in violation of Title 21, United States Code, Section 841(a)(1).

79.     All in violation of Title 21, United States Code, Section 846.

### COUNT THREE

80.     The Grand Jury incorporates numbered paragraphs 1–52 of this Second Superseding Indictment as if fully set forth herein.

81.     Beginning during, or at least in, 2011, and continuing thereafter through May 20, 2015, in the Southern District of Alabama and elsewhere, the defendants,

### JOHN PATRICK COUCH, M.D. and
### XIULU RUAN, M.D.,

conspired with each other and with others, both known and unknown to the Grand Jury, to knowingly and unlawfully distribute and dispense, possess with intent to distribute and dispense, and cause to be distributed and dispensed, a Scheduled II Controlled Substance, that is: a mixture and substance containing detectable amount of N–phenyl–N–[1–(2–phenylethyl)–4–piperidinyl] propanamide, which is commonly referred to as fentanyl (brand names: Subsys, Abstral, Fentora, Lazanda, Actiq, and Duragesic), outside the usual course of professional medical practice and not for a legitimate medical purpose, in violation of Title 21, United States Code, Section 841(a)(1).

82.     Because the conspiracy involved more than 40 grams of fentanyl, the penalty provisions of Title 21, United States Code, Section 841(b)(1)(B)(vi) apply.

83.     All in violation of Title 21, United States Code, Section 846.

### COUNT FOUR

84.     The Grand Jury incorporates numbered paragraphs 1–52 of this Second Superseding Indictment as if fully set forth herein.

85.     Beginning during, or at least in, 2011, and continuing thereafter through May 20, 2015, in the Southern District of Alabama and elsewhere, the defendants,

**JOHN PATRICK COUCH, M.D. and**
**XIULU RUAN, M.D.,**

conspired with each other and with others, both known and unknown to the Grand Jury, to

knowingly and unlawfully distribute and dispense, possess with intent to distribute and dispense,

and cause to be distributed and dispensed, Schedule III Controlled Substances, including, but not

limited to: hydrocodone, by means of prescriptions, among other means and methods, outside the

usual course of professional medical practice and not for a legitimate medical purpose, in

violation of Title 21, United States Code, Section 841(a)(1).

86.     All in violation of Title 21, United States Code, Section 846.

## COUNTS FIVE THROUGH SEVEN

87.     The Grand Jury incorporates numbered paragraphs 1–52 of this Second

Superseding Indictment as if fully set forth herein.

88.     On or about the date set forth below, in the Southern District of Alabama,

Southern Division, the defendant,

**JOHN PATRICK COUCH, M.D.,**

aided and abetted by others, both known and unknown to the Grand Jury, did knowingly,

intentionally, and unlawfully distribute and dispense a mixture and substance containing a

detectable amount of oxycodone, to wit: Roxicodone 15mg, a Schedule II Controlled Substance,

to an undercover DEA Task Force Officer for no legitimate medical purpose and outside the

usual course of professional practice.

89.     The allegations set forth in paragraphs 87–88 above, are hereby realleged and

incorporated by reference for each of the following counts, as though fully set forth therein:

| Count | Date | Patient | Controlled Substance | Number of Pills | Strength |
|-------|------|---------|----------------------|-----------------|----------|
|       |      |         |                      |                 |          |

| FIVE | 08/05/14 | "UC Patient" | Roxicodone | 90 | 15mg |
| SIX | 09/08/14 | "UC Patient" | Roxicodone | 90 | 15mg |
| SEVEN | 11/05/14 | "UC Patient" | Roxicodone | 110 | 15mg |

90.     In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2(a).

## COUNTS EIGHT THROUGH TEN

91.     The Grand Jury incorporates numbered paragraphs 1–52 of this Second Superseding Indictment as if fully set forth herein.

92.     On or about the date set forth below, in the Southern District of Alabama, Southern Division, the defendant,

### XIULU RUAN, M.D.,

aided and abetted by others, both known and unknown to the Grand Jury, did knowingly, intentionally, and unlawfully distribute and dispense a mixture and substance containing a detectable amount a Schedule II Controlled Substance, to the patients identified below, for no legitimate medical purpose and outside the usual course of professional practice.

93.     The allegations set forth in paragraphs 91–92 above, are hereby realleged and incorporated by reference for each of the following counts, as though fully set forth therein:

| Count | Date Prescribed | Patient | Controlled Substance | Number of Pills | Strength |
|-------|-----------------|---------|----------------------|-----------------|----------|
| EIGHT | 2/26/2015 | D.G. | Abstral | 32 | 400 mcg |
|       |           |      | Subsys | 60 | 400 mcg |
|       |           |      | Abstral | 32 | 400 mcg |
|       |           |      | Subsys | 60 | 400 mcg |
|       |           |      | Oxycontin | 60 | 40 mg |
|       |           |      | Norco | 90 | 10 mg |

| NINE | 4/27/2015 | K.L. | Fentora | 56 | 600 mcg |
| | | | Oxycontin | 60 | 80 mg |
| | | | Oxycodone | 120 | 15 mg |
| TEN | 7/15/2014 | E.G. | Fentora | 112 | 600 mcg |
| | | | Zohydro ER | 60 | 50 mg |

94.     In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2(a).

## COUNT ELEVEN

95.     The Grand Jury incorporates numbered paragraphs 1–52 of this Second Superseding Indictment as if fully set forth herein.

96.     On or about November 25, 2014, in the Southern District of Alabama, Southern Division, the defendant,

**XIULU RUAN, M.D.,**

aided and abetted by others, both known and unknown to the Grand Jury, did knowingly, intentionally, and unlawfully distribute the following Controlled Substance:

> A mixture and substance containing a detectable amount of Oxymorphone, a Schedule II Controlled Substance, under the brand name Opana,

for no legitimate medical purpose, and outside the usual course of professional practice, to an individual identified herein as D.W.

97.     In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

98.     The use of the prescribed substance resulted in death and serious bodily injury to D.W., thus the penalty provisions set out in Title 21, United States Code, Section 841(b)(1)(C) apply.

## COUNT TWELVE

99.     The Grand Jury incorporates numbered paragraphs 1–52 of this Second Superseding Indictment as if fully set forth herein.

100.     On or about October 10, 2012, in the Southern District of Alabama, Southern Division the defendant,

**XIULU RUAN, M.D.,**

aided and abetted by others, both known and unknown to the Grand Jury, did knowingly, intentionally, and unlawfully distribute the following Controlled Substance:

> (1) A mixture and substance containing a detectable amount of Morphine Sulfate, a Schedule II Controlled Substance, under the brand name MS-Contin,

for no legitimate medical purpose, and outside the usual course of professional practice, to an individual identified herein as J.B.

101.     In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

102.     The use of the prescribed substances resulted in death and serious bodily injury to J.B, thus the penalty provisions set out in Title 21, United States Code, Section 841(b)(1)(C) apply.

## COUNT THIRTEEN

103.     The Grand Jury incorporates numbered paragraphs 1–52 of this Second Superseding Indictment as if fully set forth herein.

104.     On or about March 5 and March 11, 2015, in the Southern District of Alabama, Southern Division, the defendant,

**JOHN PATRICK COUCH, M.D.,**

aided and abetted by others, both known and unknown to the Grand Jury, did knowingly, intentionally, and unlawfully distribute the following Controlled Substances:

> (1) A mixture and substance containing a detectable amount of Oxycodone Hydrochloride, a Schedule II Controlled Substance, under the brand name Roxicodone;

> (2) A mixture and substance containing a detectable amount of Oxycodone, a Schedule II Controlled Substance, under the brand name OxyContin,

for no legitimate medical purpose, and outside the usual course of professional practice, to an individual identified herein as K.D.

105. In violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

106. The use of the prescribed substances resulted in death and serious bodily injury to K.D., thus the penalty provisions set out in Title 21, United States Code, Section 841(b)(1)(E)(i) apply.

## COUNT FOURTEEN

107. The Grand Jury incorporates numbered paragraphs 1–52 of this Second Superseding Indictment as if fully set forth herein.

108. On or about March 18 and 31, 2014, in the Southern District of Alabama, Southern Division, the defendant,

**JOHN PATRICK COUCH, M.D.,**

aided and abetted by others, both known and unknown to the Grand Jury, did knowingly, intentionally, and unlawfully distribute the following Controlled Substances:

> (1) A mixture and substance containing a detectable amount of Oxymorphone, a Schedule II Controlled Substance, and

> (2) A mixture and substance containing a detectable amount of Morphine Sulfate Instant Release, a Schedule II Controlled Substance.

for no legitimate medical purpose, and outside the usual course of professional practice, to an individual identified herein as P.C.

109. In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

110. The use of the prescribed substances resulted in death and serious bodily injury to P.C., thus the penalty provisions set out in Title 21, United States Code, Section 841(b)(1)(C) apply.

## COUNT FIFTEEN

111. The Grand Jury incorporates numbered paragraphs 1–52 of this Second Superseding Indictment as if fully set forth herein.

112. Beginning during, or at least in, 2011, and continuing through May 20, 2015, in the Southern District of Alabama, Southern Division, and elsewhere, the defendants,

**JOHN PATRICK COUCH, M.D. and**
**XIULU RUAN, M.D.,**

did knowingly, willfully, and unlawfully combine, conspire, confederate, and agree with each other, and with others, both known and unknown to the Grand Jury, to commit certain offenses against the United States, to wit:

> to knowingly and willfully execute, and attempt to execute a scheme and artifice to defraud a healthcare benefits program, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, a healthcare benefits program in connection with the delivery of and payment for healthcare benefits, items, and services, in violation of Title 18, United States Code, Section 1347(a).

## OBJECTIVE OF THE CONSPIRACY

113.    The objective of the conspiracy was to unlawfully increase, through false and fraudulent manners, means, and pretenses, the reimbursements received by PPSA and C&R Pharmacy from private, state, and federal healthcare benefits programs.

## MANNER AND MEANS OF THE CONSPIRACY

114.    The manner and means used to achieve this objective included, but were not limited to, the following:

A.    Billing patients' insurance providers for Controlled Substances that were not prescribed for a legitimate medical purpose or were prescribed outside the usual course of professional practice;

B.    Submitting false, fraudulent, and materially misleading medical information to patients' insurance providers for the purpose of getting their insurance providers to pay for extremely dangerous and expensive TIRF drugs;

C.    Running and then billing patients' insurance providers for various lab tests, including urine drug screens, for no legitimate medical purpose and outside the usual course of professional practice;

D.    Falsely and fraudulently billing patients' insurance providers for office visits using a physician's national provider identifier number, when the physician did not see, treat, or render any service to the patient.

115.    All in violation of Title 18, United States Code, Section 1349.

## COUNT SIXTEEN

116.    The Grand Jury incorporates numbered paragraphs 1–52 of this Second Superseding Indictment as if fully set forth herein.

117.     From in or about March 5, 2011, and continuing through in or about May 20, 2015, in the Southern District of Alabama, Southern Division, and elsewhere, the defendants,

**JOHN PATRICK COUCH, M.D. and
XIULU RUAN, M.D.,**

did knowingly, willfully, and unlawfully combine, conspire, confederate, and agree together with each other, and with co-conspirators "M.D." and Christopher Manfuso, neither of whom are named defendants herein, and other persons, both known and unknown to the Grand Jury, to commit certain offenses against the United States, to-wit:

> to knowingly and willfully offer, pay, solicit, and receive any remuneration (including any kickback, bribe, or rebate), directly or indirectly, overtly or covertly, in cash or in kind in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, and in return for purchasing, leasing, ordering, and arranging for or recommending purchasing, leasing, and ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.  In violation of Title 42, United States Code, Section 1320a-7b(b).

### OBJECTIVE OF THE CONSPIRACY

118.     The objective of the conspiracy was for **RUAN** and **COUCH** to unlawfully receive illegal kickbacks as an inducement and in exchange for referrals of workers compensation patients.

### MANNER AND MEANS OF THE CONSPIRACY

119.     Industrial Pharmaceuticals Management ("IPM"), owned by co-conspirator M.D., was a California-based company that specialized in establishing and managing in-house dispensaries in medical clinics that treated workers compensation ("WC") patients.  Once a contract was signed allowing IPM to manage the in-house dispensary, IPM supplied the dispensary with drugs and provided doctors with potential formularies.  To induce and in

29

exchange for doctors' in-house dispensing business, there were times that IPM paid certain doctors large sums of money in the form of monthly "guarantees."

120.    In March 2011, **RUAN** and **COUCH** entered into contracts with IPM, whereby IPM agreed to manage a WC dispensary within PPSA. These contracts were signed by co-conspirator M.D. Christopher Manfuso was the regional manager who oversaw the IPM dispensary at PPSA.

121.    To induce **RUAN** and **COUCH** to sign these contracts, IPM offered to pay **RUAN** and **COUCH** monthly guaranteed payments of $45,000.00 and $18,000.00, respectively. A second contract between IPM and **RUAN** increased his guarantee to $53,000.00 per month. Once the contracts were signed, these guaranteed payments continued to be made each month in exchange for **RUAN** and **COUCH** referring their WC patients to the IPM dispensary within PPSA.

122.    In December 2013, Manfuso left the employment of IPM and formed a new WC dispensary company called Comprehensive RX Management ("CRM"). When he formed CRM, Manfuso purchased some of IPM's customer accounts, including the accounts of **RUAN** and **COUCH**. The kickback payments in exchange for WC patient referrals continued with **RUAN's** payments increasing up to $80,000.00 per month.

123.    Between May 24, 2011 and January 21, 2015, IPM and later CRM paid $864,770.41 to **COUCH** and $1,765,132.46 to **RUAN** to induce, and in exchange for, **RUAN** and **COUCH** referring their WC patients to the IPM dispensary.

124.    The kickback payments made by IPM, and later CRM, were not paid to PPSA. Rather, the monthly "guarantees" were paid to separate personal and business accounts controlled by **RUAN** and **COUCH**.

125.   **RUAN** and **COUCH** received a combined $2,629,902.87, in their personal capacity, as an inducement and in exchange for WC patient referrals.

**OVERT ACTS**

126.   On or about September 20, 2012, **COUCH** received a check numbered 11667, payable to John Patrick Couch, M.D., from IPM, in the amount of $38,543.70.

127.   On or about February 25, 2013, **RUAN** received a check numbered 12649, payable to Ruan Companies, LLC, from IPM, in the amount of $53,000.00.

128.   On or about September 18, 2013, **COUCH** received a check numbered 13570, payable to Physicians Compounding Solutions, LLC, from IPM, in the amount of $21,860.95.

129.   On or about August 15, 2014, **COUCH** received a check number 1280, payable to Physicians Compounding Solutions, LLC, from CRM, in the amount of $33,020.85.

130.   On or about November 18, 2014, **RUAN** received a check numbered 1452, payable to Ruan Companies, LLC, from CRM, in the amount of $80,000.00.

131.   On or about January 21, 2015, **RUAN** received a check numbered 1555, payable to Ruan Companies, LLC, from CRM, in the amount of $75,000.00.

132.   All in violation of Title 18, United States Code, Section 371.

**COUNT SEVENTEEN**

133.   The Grand Jury incorporates numbered paragraphs 1–52 of this Second Superseding Indictment as if fully set forth herein.

134.   From in or about August 2012, and continuing through May 20, 2015, in the Southern District of Alabama, Southern Division, and elsewhere, the defendants,

**JOHN PATRICK COUCH, M.D. and
XIULU RUAN, M.D.,**

did knowingly, willfully, and unlawfully combine, conspire, confederate, and agree with each

other, with co-conspirator Natalie Perhacs, who is not named as a defendant herein, and with other persons, both known and unknown to the Grand Jury, to commit certain offenses against the United States to- wit:

> to knowingly and willfully offer, pay, solicit, and receive any remuneration (including any kickback, bribe, or rebate), directly or indirectly, overtly or covertly, in cash or in kind in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, and in return for purchasing, leasing, ordering, and arranging for or recommending purchasing, leasing, and ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program. In violation of Title 42, United States Code, Section 1320a-7b(b).

### OBJECTIVE OF THE CONSPIRACY

135.   The objective of the conspiracy was the unlawful payment to and receipt of illegal kickbacks by **RUAN** and **COUCH** as an inducement and in exchange for their prescribing of the TIRF drug Subsys to patients at PPSA.

### MANNER AND MEANS OF THE CONSPIRACY

136.   In January 2012, the FDA approved a new TIRF drug under the brand name Subsys. Subsys was manufactured by Insys Therapeutics, Inc.

137.   The only FDA-approved indication for Subsys was for the "management of breakthrough pain in adult cancer patients who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain." Subsys is marketed in single-dose spray bottles in strengths of 100mcg, 200mcg, 400mcg, 600mcg, 800mcg, 1200mcg, and 1600mcg.

138.   Due to both the extreme dangers and expense of Subsys, many healthcare providers required prior approval before they would reimburse for a patient's Subsys

other, with co-conspirator Natalie Perhacs, who is not named as a defendant herein, and with

other persons, both known and unknown to the Grand Jury, to commit certain offenses against

the United States to- wit:

> to knowingly and willfully offer, pay, solicit, and receive any
> remuneration (including any kickback, bribe, or rebate), directly or
> indirectly, overtly or covertly, in cash or in kind in return for
> referring an individual to a person for the furnishing or arranging
> for the furnishing of any item or service for which payment may be
> made in whole or in part under a Federal health care program, and
> in return for purchasing, leasing, ordering, and arranging for or
> recommending purchasing, leasing, and ordering any good,
> facility, service, or item for which payment may be made in whole
> or in part under a Federal health care program. In violation of Title
> 42, United States Code, Section 1320a-7b(b).

## OBJECTIVE OF THE CONSPIRACY

135.    The objective of the conspiracy was the unlawful payment to and receipt of illegal

kickbacks by **RUAN** and **COUCH** as an inducement and in exchange for their prescribing of the

TIRF drug Subsys to patients at PPSA.

## MANNER AND MEANS OF THE CONSPIRACY

136.    In January 2012, the FDA approved a new TIRF drug under the brand name

Subsys.  Subsys was manufactured by Insys Therapeutics, Inc.

137.    The only FDA-approved indictation for Subsys was for the "management of

breakthrough pain in adult cancer patients who are already receiving and who are tolerant to

around-the-clock opioid therapy for their underlying persistent cancer pain."  Subsys is marketed

in single-dose spray bottles in strengths of 100mcg, 200mcg, 400mcg, 600mcg, 800mcg,

1200mcg, and 1600mcg.

138.    Due to both the extreme dangers and expense of Subsys, many healthcare

providers required prior approval before they would reimburse for a patient's Subsys

prescription.

139.    Starting in or about April 2012, and continuing up to May 20, 2015, **RUAN** and **COUCH** wrote thousands of prescriptions for Subsys, nearly all of which went to PPSA patients who did not have cancer.

140.    A vast majority of these prescriptions for Subsys were filled at C&R Pharmacy, which was owned by **RUAN** and **COUCH**.

141.    By early 2013, **RUAN** and **COUCH** had become two of the top ten largest volume prescribers of Subsys in the entire nation.

142.    In April 2013, Insys Therapeutics hired Natalie Perhacs to be the Subsys drug representative for **RUAN** and **COUCH**. Perhacs's commissions were tied to the amount of Subsys **RUAN** and **COUCH** prescribed to their patients. During the 25–month period between April 2013 and May 2015, Insys Therapeutics paid Perhacs over $700,000.00.

143.    One of Perhacs's roles as the representative handling **RUAN** and **COUCH** was to set up speaker engagements during which **RUAN** and **COUCH** were to present information about Subsys to other potential prescribers of the drug. Perhacs attended these speaking engagements on behalf of Insys. However, on many occasions, the speaking engagements were only attended by, **RUAN** and **COUCH,** PPSA employees, and Insys employees.

144.    Between August 2012 and May 2015, Insys paid **RUAN** and **COUCH** a combined total in excess of $115,000.00. While this money was ostensibly paid for "speaking fees," it was actually paid to induce, and in exchange for, **RUAN** and **COUCH** prescribing high volumes of Subsys.

## OVERT ACTS

145.    On or about March 1, 2013, **RUAN** received check number 10479, payable to

33

Xiulu Ruan, in the amount of $2,400.00.

146.  On or about May 9, 2013, **COUCH** received check number 11090, payable to John Patrick Couch, in the amount of $3,200.00.

147.  On or about February 13, 2014, **COUCH** received check number 1920, payable to John Patrick Couch 1099, in the amount of $1,600.00.

148.  On or about May 1, 2014, **RUAN** received check number 3057, payable to Xiulu Ruan XLR Properties, LLC., in the amount of $6,000.00.

149.  On or about October 31, 2014, **COUCH** received check number 5091, payable to John Patrick Couch 1099, in the amount of $3,750.00.

150.  On or about November 14, 2014, **RUAN** received check number 5390, payable to Xiulu Ruan XLR Properties, LLC., in the amount of $3,750.00.

151.  All in violation of Title 18, United States Code, Section 371.

## COUNT EIGHTEEN

152.  The Grand Jury incorporates numbered paragraphs 1–52 of this Second Superseding Indictment as if fully set forth herein.

153.  From in or about September 2014, and continuing through in or about February 2015, in the Southern District of Alabama, Southern Division, and elsewhere, the defendants,

**JOHN PATRICK COUCH, M.D. and**
**XIULU RUAN, M.D.,**

did knowingly, willfully, and unlawfully combine, conspire, confederate, and agree with each other, and with other persons, both known and unknown to the Grand Jury, to commit certain offenses against the United States to-wit:

> to knowingly and willfully solicit and receive any remuneration (including any kickback, bribe, or rebate), directly or indirectly, overtly or covertly, in cash or in kind in return for referring an

34

individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, and in return for purchasing, leasing, ordering, and arranging for or recommending purchasing, leasing, and ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program. In violation of Title 42, United States Code, Section 1320a-7b(b).

## OBJECTIVE OF THE CONSPIRACY

154.     The objective of the conspiracy was the unlawful receipt of illegal kickbacks by **RUAN** and **COUCH**, through C&R Pharmacy, as an inducement and in exchange for their prescribing of the TIRF drug Abstral to patients at PPSA.

## MANNER AND MEANS OF THE CONSPIRACY

155.     In January 2011, the FDA approved a new TIRF drug under the brand name Abstral.  During the time period alleged in this count, Abstral was manufactured by Galena Biopharma, Inc.

156.     The only FDA-approved indication for Abstral was for the "management of breakthrough pain in cancer patients 18 years of age and older who are already receiving, and who are tolerant to, opioid therapy for their underlying persistent cancer pain."  Abstral was marketed as a dissolvable oral tablet in dosage strengths of 100mcg, 200mcg, 300mcg, 400mcg, 600mcg, and 800mcg.

157.     Due to both the extreme dangers and expense of Abstral, many healthcare providers required prior approval before they would reimburse for a patient's Abstral prescription.

158.     **RUAN** and **COUCH** began prescribing Abstral in early 2011.  However, they did this very sparingly until October 2013.

159.     Beginning in the 4th quarter of 2013, **RUAN** and **COUCH** went from prescribing

a few hundred micrograms of Abstral per month to prescribing millions of micrograms of Abstral per month. This meteoric rise in **RUAN** and **COUCH** prescribing Abstral coincided with each doctor purchasing approximately $800,000.00 of stock in Abstral's manufacturer, Galena Biopharma. After buying a combined total of approximately $1,600,000.00 in Galena stock, **RUAN** and **COUCH** quickly became the Number One and Number Two prescribers, respectively, of Abstral in the entire United States.

160. Between the 4th quarter of 2013 though the 4th quarter of 2014, approximately 30% of all Abstral prescriptions written in the entire nation were written by **RUAN** and **COUCH**. **RUAN,** alone, accounted for approximately 1 out of every 5 Abstral prescriptions written during this time period. Nearly all of the prescriptions **RUAN** and **COUCH** wrote for Abstral were written off-label for patients who did not have "underlying persistent cancer pain."

161. Despite leading the nation in Abstral prescribing in 2014, **RUAN** and **COUCH** drastically cut back the number of prescriptions they wrote between April and September 2014. This dip from over 2,000,000 micrograms per month to less than 1,000,000 coincided with a dramatic drop in the price of Galena stock.

162. On or about October 1, 2014, after four straight months in which neither **RUAN** nor **COUCH** prescribed more than 1,000,000 micrograms of Abstral, Galena entered into a rebate agreement with C&R Pharmacy whereby, Galena would pay a scaled rebate based on the volume of Abstral purchased by C&R Pharmacy. C&R Pharmacy was owned by **RUAN** and **COUCH**, and almost exclusively filled prescriptions written by **RUAN** and **COUCH**.

163. Immediately after entering into the rebate agreement, **RUAN** and **COUCH** resumed prescribing large volumes of Abstral.

164. Thereafter, in February 2015, C&R Pharmacy received a payment of $97,924.00

as a rebate based on the volume of Abstral purchased by the pharmacy.

## OVERT ACTS

165. On or about October 1, 2014, C&R Pharmacy, which is jointly owned by **RUAN** and **COUCH,** entered into a rebate agreement with Galena Biopharma.

166. On or about February 18, 2015, Galena Biopharma executed a wire transfer in the amount of $97,924.00 to the C&R Pharmacy bank account ending in x7003.

167. All in violation of Title 18, United States Code, Section 371.

## COUNT NINETEEN

168. The Grand Jury incorporates number paragraphs 1–52 of this Second Superseding Indictment as if fully set forth herein.

169. From on or about January 1, 2011 through in or about May 20, 2015, in the Southern District of Alabama, Southern Division, and elsewhere, the defendants,

**JOHN PATRICK COUCH, M.D. and**
**XIULU RUAN, M.D.,**

did conspire with one another and others, both known and unknown to the Grand Jury, including co-conspirators Natalie Perhacs, Justin Thomas Palmer, and Bridgette Parker, none of whom are named as defendants herein, to execute and attempt to execute a scheme and artifice to defraud, described below, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit: (1) Wire Fraud in violation of Title 18, United States Code, Section 1343, and (2) Mail Fraud in violation of Title 18, United States Code, Section 1341.

## OBJECTIVE OF THE CONSPIRACY

170. The objects of the conspiracy, among others, were to procure payments from

healthcare providers to which PPSA and the defendants were not entitled by false representations; and to procure payments for dispensing Controlled Substances to Workers Compensation patients, which Controlled Substances were selected because of the higher reimbursable to the defendants rather than for the needs of the patient.

### Manner and Means of the Conspiracy

171. The defendants **COUCH** and **RUAN** set up and maintained an online PPSA account with Blue Cross/Blue Shield ("BC/BS"), and other healthcare providers, so as to electronically submit medical claims and so as to be reimbursed electronically by BC/BS, and other healthcare providers.

172. Members of the conspiracy, both known and unknown to the Grand Jury, fraudulently submitted claims for patient visits with **COUCH** or **RUAN**, which had, in fact, been patient visits with a PPSA Physician Extender, rather than a doctor. The reimbursements for this "up-coding" of services resulted in PPSA being paid approximately 30% more per doctor visit by BCBS, and other healthcare providers, than the payment to which PPSA and the doctors were entitled.

173. **RUAN** would verify by e-mail with co-conspirator Manfuso, who is not named as a defendant herein; who worked for IPM and subsequently owned CRM, and who did not live in the State of Alabama, which Controlled Substances resulted in higher reimbursables to PPSA and the defendants and, based on that fact, **RUAN** requested and ordered those Controlled Substances to be delivered to PPSA's dispensary at the PPSA Springhill Avenue location in Mobile, Alabama.

174. Controlled Substances were delivered to the PPSA Springhill Avenue location in Mobile, Alabama, by a commercial interstate carrier, to include but not limited to FedEx, and the

United States Postal Service. Thereafter, **RUAN** and **COUCH** and other members of the conspiracy, would dispense the Controlled Substances based on the false representation that the Controlled Substances, with higher reimbursables, were the medications necessary to treat the Worker's Compensation patient.

175.    **RUAN** and **COUCH** were paid an agreed upon monthly amount from IPM, and subsequently from CRM, for dispensing the Controlled Substances. These monthly checks were delivered to **RUAN** and **COUCH** by an interstate commercial carrier.

176.    In carrying out their scheme, members of the conspiracy would use or cause to be used commercial interstate carriers and the United States Postal Service, and would use or cause to be used interstate wire communications, that is e-mails and telephone calls, to be used for other purposes in furtherance of said scheme and artifice to defraud.

177.    Specifically, as part of said conspiracy, members of the conspiracy, both known and unknown to the Grand Jury, fraudulently procured electronic payment from BCBS, and other healthcare providers, to which they were not entitled. The submission of bills to BCBS and the payment from BCBS caused wire transmissions, to include e-mails, and electronic wire transfers, to be sent to and from the state of Alabama to places outside the state of Alabama, to include the Southern District of Alabama.

178.    Perhacs and others aided **RUAN** and **COUCH** in submitting false, fraudulent, and materially misleading documentation to patients' insurance providers in an effort to get reimbursed for the off-label prescribing of dangerous and expensive TIRF cancer drugs.

179.    All in violation of Title 18, United States Code, Section 1349.

## COUNT TWENTY

180.    The Grand Jury incorporates numbered paragraphs 1–52 of this Second

Superseding Indictment as if fully set forth herein.

181.　　From on or about or about March 5, 2011, through in or about May 20, 2015, in the Southern District of Alabama, Southern Division, and elsewhere, the defendant,

**XIULU RUAN, M.D.,**

aided and abetted by Christopher Manfuso, who is not named as a defendant herein, and by others, both known and unknown to the Grand Jury, did knowingly conspire, confederate, and agree with other persons, both known and unknown to the Grand Jury, to commit an offense against the United States, in violation of Title 18, United States Code, Section 1957, to wit: to knowingly engage and attempt to engage, in monetary transactions by, through and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, among other means and methods, transferring funds from bank accounts to other individuals by wire transfers, such property having been derived from a specified unlawful activity, that is, violations of and conspiracies to violate Title 18, United States Code, Section 1349 (conspiracy to commit healthcare fraud), and Section 371 (conspiracy to violate the Anti-Kickback Statute); and Title 21, United States Code, Section 846 (conspiracy to distribute Controlled Substances).

182.　　In violation of Title 18, United States Code, Section 1956(h).

## COUNTS TWENTY-ONE AND TWENTY-TWO

183.　　The Grand Jury incorporates numbered paragraphs 1–52 of this Second Superseding Indictment as if fully set forth herein.

184.　　On or about the dates set forth below, in the Southern District of Alabama, Southern Division, the defendant,

**XIULU RUAN, M.D.,**

aided and abetted by others, both known and unknown to the Grand Jury, knowingly engaged and attempted to engage in the following monetary transactions by, through and to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000; that is the deposit, withdrawal, transfer, and exchange of U.S. currency, funds, or monetary instruments, such property having been derived from a specified unlawful activity, namely violations of and conspiracies to violate Title 18, United States Code, Section 1349(conspiracy to commit healthcare fraud), and 371(conspiracy to violate the anti-kickback statutes); and Title 21, United States Code, Section 846 (conspiracy to distribute Controlled Substances).

185.    With respect to Counts Twenty-One and Twenty-Two set forth below, **RUAN** caused funds to be wired from the bank accounts identified below to the individuals and the accounts listed in the "Recipient" column.

| Count | Date | Originating Financial Institution and Account | Recipient | Amount |
|-------|------|-----------------------------------------------|-----------|--------|
| TWENTY-ONE | 08/14/2014 | Wire transfer from State Bank & Trust Acct. ending 5553, in the name of XLR Exotic Autos LLC | JPMorgan Chase Bank, Acct. ending 9273, Dallas, Texas | $124,355.87 |
| TWENTY-TWO | 09/26/2014 | Wire transfer from State Bank & Trust Acct. ending 5553, in the name of XLR Exotic Autos LLC | Comerica Bank Acct. # ending 1629, San Diego, California | $110,000.00 |

186.    All in violation of Title 18, United States Code, Section 1957 and 2(a).

## FORFEITURE NOTICES

Pursuant to Rule 32.2(a), Fed. R. Crim. P., the allegations contained in Counts One through Twenty-Two of this Second Superseding Indictment are hereby repeated, realleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture.

## RACKETEERING FORFEITURE (COUNT ONE)
### (RICO CONSPIRACY)

The defendants, **JOHN PATRICK COUCH** and **XIULU RUAN**, are hereby notified that, upon conviction of the violation of Title 18, United States Code, Section 1962, as charged in Count One of this Second Superseding Indictment, the defendants shall forfeit, pursuant to Title 18, United States Code, Section 1963:

      a)     All interests acquired and maintained in violation of Title 18, United States Code, Section 1962;

      b)     All interests in, securities of, claims against, and property and contractual rights of any kind affording a source of influence over, the enterprise named and described herein which the defendant established, operated, controlled, conducted, and participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and

      c)     All property constituting and derived from proceeds obtained, directly and indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1962.

The property subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1), (a)(2)(A) – (D), (a)(3), and Title 21, United States Code, Section 853(a)(3), includes, but is not limited to, the following assets:

     A.  **XIULU RUAN's** Alabama Medical License, number MD25262;

     B.  **JOHN PATRICK COUCH's** Alabama Medical License, number MD20444;

     C.  **JOHN PATRICK COUCH's** Georgia Medical License, number 42552;

     D.  **JOHN PATRICK COUCH's** California Medical License, number 82209;

     E.  A sum of money in the amount of at least $40,000,000.00 in United States currency, representing the total amount of proceeds obtained by the defendants, as a result of their violation of Title 18, United States Code, Section 1962;

     F.  The contents of the accounts and funds associated with PPSA and C&R Pharmacy as listed on Page 49.

     G.  The contents of the accounts associated with **RUAN** as listed on Page 49-50.

     H.  The contents of the accounts associated with **COUCH** as listed on Page 49-50.

    I.    The vehicles associated with **RUAN,** as listed on Page 50.

    J.    The vehicles associated with **COUCH,** as listed on Page 50.

    K.    The real property associated with **RUAN,** as listed on Page 51.

    L.    The real property associated with **COUCH,** as listed on Page 51.

All pursuant to Title 18, United States Code, Sections 1963(a)(1), (a)(2)(A)–(D), and (a)(3), and Title 21, United States Code, Section 853(a)(3).

### CONSPIRACY TO DISTRIBUTE AND DISPENSE FORFEITURE (COUNTS TWO THROUGH FOUR) AND DISTRIBUTION OF A CONTROLLED SUBSTANCE (COUNTS FIVE THROUGH FOURTEEN)

The allegations contained in Counts Two through Fourteen of this Second Superseding Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 21, United States Code, Section 853(a)(1) and (a)(2).

Upon conviction of an offense as set forth in Counts Two through Fourteen of this Second Superseding Indictment, the defendants **JOHN PATRICK COUCH** and **XIULU RUAN** shall forfeit to the United States of America, pursuant to Title 21, United States Code, Section 853(a)(1) and (a)(2), any property, real or personal, which constitutes or is derived from any proceeds the defendants **COUCH** and **RUAN,** obtained, directly or indirectly, as the result of such violation(s), and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation(s). The property to be forfeited includes, **but is not limited to**, the following:

    A.    **XIULU RUAN's** Alabama Medical License, number MD25262;

    B.    **JOHN PATRICK COUCH's** Alabama Medical License, number MD20444;

    C.    **JOHN PATRICK COUCH's** Georgia Medical License, number 42552;

    D.    **JOHN PATRICK COUCH's** California Medical License, number 82209;

    E.    A money judgment against **JOHN PATRICK COUCH** and **XIULU RUAN** representing a sum of money equal to the proceeds the defendants obtained, directly or indirectly, as a result of a violation of Title 21, U.S.C. § 846.

    F.    The contents of the accounts associated with PPSA and C&R Pharmacy**,** as listed

on Page 49.

    G.  The contents of the accounts associated with **RUAN,** as listed on Page 49-50.

    H.  The contents of the accounts associated with **COUCH,** as listed on Page 49-50.

    I.   The vehicles associated with **RUAN,** as listed on Page 50.

    J.   The vehicles associated with **COUCH,** as listed on Page 50.

    K.  The real property associated with **RUAN,** as listed on Page 51.

    L.  The real property associated with **COUCH,** as listed on Page 51.

All pursuant to Title 21, United States Code, Sections 853(a)(1) and (a)(2).

## CONSPIRACY TO VIOLATE ANTI-KICKBACK STATUTE FORFEITURE
### (COUNTS SIXTEEN THROUGH EIGHTEEN)

The allegations contained in Counts Sixteen through Eighteen are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

Upon conviction of the offense in violation of Title 18, United States Code, Section 371 set forth in Count Sixteen, Seventeen, or Eighteen, of this Second Superseding Indictment, the defendants, **JOHN PATRICK COUCH** and **XIULU RUAN** shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived, from proceeds traceable to a violation of an offense constituting specified unlawful activity, including an act or activity constituting an offense involving a Federal healthcare offense under Title 18, United States Code, Section 1956(c)(7)(F), or a conspiracy to commit such an offense. The property to be forfeited includes, but is not limited to, the following:

    A. A money judgment against **COUCH** and **RUAN** representing a sum of money equal to the proceeds the defendants obtained as a result of such, or proceeds traceable to such violation.

    B. The contents of the accounts associated with PPSA and C&R Pharmacy, as listed

on Page 49.

  C. The contents of the accounts associated with **RUAN,** as listed on Page 49-50.

  D. The contents of the accounts associated with **COUCH,** as listed on Page 49-50.

  E. The vehicles associated with **RUAN,** as listed on Page 50.

  F. The vehicles associated with **COUCH,** as listed on Page 50.

  G. The real property associated with **RUAN,** as listed on Page 51.

  H. The real property associated with **COUCH,** as listed on Page 51.

All pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

### CONSPIRACY TO COMMIT HEALTH CARE FRAUD FORFEITURE (COUNT FIFTEEN), AND CONSPIRACY TO COMMIT WIRE AND MAIL FRAUD FORFEITURE (COUNT NINETEEN)

  The allegations contained in Counts Fifteen and Nineteen of this Second Superseding Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture.  Pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), if convicted of the offenses set forth in Count Fifteen or Count Nineteen, defendants **JOHN PATRICK COUCH** and **XIULU RUAN** shall forfeit property, real or personal, which constitutes or is derived from proceeds traceable to the offense, or a conspiracy to commit such offense.  The property to be forfeited includes, **but is not limited to**, the following:

  A. A money judgment against **JOHN PATRICK COUCH** and **XIULU RUAN** representing a sum of money equal to the proceeds the defendants obtained, directly or indirectly, as a result of a violation of Title 18, U.S.C. § 1349.

  B. The contents of the accounts associated with PPSA and C&R Pharmacy, as listed on Page 49.

  C The contents of the accounts associated with **RUAN,** as listed on Page 49-50.

  D. The contents of the accounts associated with **COUCH,** as listed on Page 49-50.

  E. The vehicles associated with **XIULU RUAN,** as listed on Page 50.

F.   The vehicles associated with **COUCH,** as listed on Page 50.

G.   The real property associated with **RUAN,** as listed on Page 51.

H.   The real property associated with **COUCH,** as listed on Page 51.

All pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

### CONSPIRACY TO COMMIT MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTIVITY FORFEITURE (COUNT TWENTY); AND MONEY LAUNDERING FORFEITURE (COUNTS TWENTY-ONE AND TWENTY-TWO)

Pursuant to Title 18, United States Code, Section 982(a)(1), if defendant **XIULU RUAN** is convicted of Count Twenty or Count Twenty-One or Twenty-Two, he shall forfeit to the United States all property, real or personal, involved in such offense(s) and all property traceable to such property.

The Property to be forfeited includes, but is not limited to, the following:

A.   A money judgment against **RUAN,** representing a sum of money equal to all property, real or personal, involved in such offense(s), and all property traceable to such property.

B.   The contents of the accounts associated with PPSA and C&R Pharmacy, as listed on Page 49.

C.   The contents of the accounts associated with **RUAN,** as listed on Page 50.

D.   The vehicles associated with **RUAN,** as listed on Page 51.

E.   The real property associated with **RUAN,** as listed on Page 51.

All pursuant to Title 18, United States Code, Section 982(a)(1).

### SUBSTITUTE ASSETS

If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants, **JOHN PATRICK COUCH** and **XIULU RUAN,**

(a)      cannot be located upon the exercise of due diligence;

(b)      has been transferred or sold to, or deposited with, a third party;

      (c)    has been placed beyond the jurisdiction of the court;

      (d)    has been substantially diminished in value; or

      (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), and Section 982(b)(1), Title 21, United States Code, Section 853(p), as incorporated by 28 U.S.C. § 2461, and Rule 32.2 Fed. R. Crim. P., to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above.

A TRUE BILL

███████████████████████

FOREMAN, UNITED STATES GRAND JURY
SOUTHERN DISTRICT OF ALABAMA

KENYEN R. BROWN
UNITED STATES ATTORNEY

By:

DEBORAH A. GRIFFIN
Assistant United States Attorney

CHRISTOPHER J. BODNAR
Assistant United States Attorney

VICKI M. DAVIS
Assistant United States Attorney
Chief, Criminal Division           APRIL 2016

47

**The accounts and funds associated with PPSA and C&R Pharmacy:**

1. Wells Fargo account ending in x6971, in the name of PPSA;

2. Wells Fargo account ending x1719, in the name of C&R, L.L.C.;

3. Wells Fargo account ending x7003, in the name of C&R Pharmacy, L.L.C.;

4. $25,595.71 from JPMorganChase check ending 2682, payable to C&R Pharmacy; and

5. $175,773.13 from Bank of America account ending 7563, payable to C&R Pharmacy.

**The bank and financial accounts associated with RUAN:**

1. State Bank & Trust (hereinafter "SB&T") account ending in x5553, in the name of XLR Exotic Autos, L.L.C.;

2. SB&T account ending in x5264, in the name of Ruan Companies, L.L.C;

3. SB&T account ending in x6197 in the name of Xiulu Ruan;

4. Wells Fargo account ending in x1921, in the name of XLR Properties, L.L.C.;

5. Wells Fargo account ending in x1212, in the name of Physicians Weight Loss and Wellness, L.L.C.;

6. Community Bank account ending in x9013, in the name of Xiulu Ruan;

7. Capital One Sharebuilder Investment Account ending in x6197-01 in Ruan's name;

8. Voya Financial 401K account plan ending in x7645 in Ruan's name;

9. College Counts 529 Fund, accounts ending in x3712

10. College Counts 529 Fund, accounts ending in x3713.

**The contents of the following accounts associated with COUCH:**

1. Wells Fargo account ending in x0015, in Couch's name;

2. Wells Fargo account ending in x6997, in the name of Physician's Compounding Solutions, L.L.C.;

3. Wells Fargo Account ending in x9824, in Couch's name;

4. Wells Fargo account ending in x6989, in the name of JPC Properties, L.L.C.;

5. Trustmark account ending in x0135, in Couch's name;

6. & 7. E-Trade Investment accounts ending in x4755 and x8497;

8. Voya Financial 401K account plan # ending in x7645;

9. & 10.   Allianz Annuity accounts ending in x6369 and x5389;

11. – 13.   College Counts 529 Fund, accounts ending in x2423, x8641 and X2406, all owned by Couch.

**The following vehicles associated with RUAN:**

1.   Aston Martin DB9 Volante, VIN #SCFAB02AX6GB04617;

2.   Audi R8 Spyder VIN #WUATNAFG2BN002379

3.   2007 Bentley Continental GT, VIN #SCBDR33W47C048251;

4.   1987 BMW M6, VIN #WBAEE1400H2560721;

5.   Ferrari F430 Convertible, VIN #ZFFEW59A070156841;

6.   Ferrari 599 GTB, VIN #ZFFFC60A270150619;

7.   1994 Lamborghini Diablo, VIN #ZA9DU07P2RLA12227;

8.   2008 Lamborghini, VIN #ZHWBU47M78LA02880;

9.   2005 Mercedes SLR, VIN #WDDAJ76E45M000070;

10.   2011 Mercedes Model SLS AMG, VIN #WDDRJ7HA2BA002474;

11.   2013 Mercedes SLS AMG GT, VIN #WDDRK7JA0DA010048;

12.   Shelby Series 1, VIN #5CXSA1816XL000159;

13.   Spyker C8 Laviolette VIN #XL9BA11G69Z363202;

14.   2005 Bently Armage (VIN #SCBLC43FX5CX10639);

15.   2005 Bentley Continental GT (VIN SCBCR63W65C024205);

16.   2006 Saleen S7 (VIN 1S9SB18126S000074);

17.   2007 Porsche 911 GT3 (VINWP0AC29997S792687);

18.   2005 Porsche 9TC  (VIN WP0CB29965S675240)

**The following vehicles associated with COUCH:**

1.   2008 Cadillac Escalade, VIN 1GYFK66848R221963;

2.   2013 Maserati, VIN ZAM45VLA3D0072574;

3.   2015 Porsche 911, VIN #WP0BB2A96FS135380;

4.   2006 Porsche 911 Cabriolet (VIN WP0CB299X6S765878)

5.   1969 Chevrolet Corvette Sting Ray (VIN 194379S707748)

**The following real property associated with RUAN:**

1.  2800 Churchbell Ct. Mobile, Alabama;
2.  1323 Leroy Stevens Road, Mobile, Alabama, 36695 (Mobile County), (Parcel number R022707253000005.002), and which is more particularly described as: Lot 2 Byrum Family Division Map Book 129 Page 35.


**The following real property associated with COUCH:**

1.  319 Woodbridge Drive Daphne, Alabama;
2.  Unit #7, 25040 Perdido Beach Blvd Orange Beach, Alabama;
3.  Unit C-804, 28105 Perdido Beach Blvd Orange Beach, Alabama.



## PENALTY PAGE

**CASE STYLE:**         **UNITED STATES v. JOHN PATRICK COUCH, et.al.**

**DEFENDANTS:**       **JOHN PATRICK COUCH (COUNTS 1 - 7, 13 & 14, 15 - 19)**
                                      **XIULU RUAN (COUNTS 1 - 4, 8 – 12, 15 - 22)**

**USAO NO:**            **13R00521**

**AUSAs:**              **Deborah A. Griffin and Christopher Bodnar**

**CODE VIOLATIONS:**
**COUNT 1:**            **18 U.S.C. §1962(d), RICO Conspiracy**
**COUNTS 2 - 4:**       **21 U.S.C. § 846, Drug Conspiracy**
**COUNTS 5-14:**        **21 U.S.C. § 841(a)(1), Distribution of a Controlled Substance**
**COUNT 15:**          **18 U.S.C. § 1349, Healthcare Fraud Conspiracy**
**COUNTS 16-18:**      **18 U.S.C. § 371, Conspiracy to Violate Anti-Kickback Statute**
**COUNT 19:**          **18 U.S.C. § 1349, Wire and Mail Fraud Conspiracy**
**COUNT 20:**          **18 U.S.C. § 1956(h), Conspiracy to Commit Money Laundering**
**COUNTS 21 & 22:**     **18 U.S.C. § 1957, Money Laundering**

**PENALTIES:**

**COUNTS 1, 2, 4–10, & 19:**   20 yrs/$250,000/5 yrs SRT/$100 SA
**COUNT 3:**                   5 yrs to 40 yrs/$2,000,000/5 yrs SRT/$100 SA
**COUNTS 11-14:**           20 yrs to life/$10,000,000/5 yrs SRT/$100 SA
**COUNTS 15, 20 - 22:**      10 yrs/$250,000/3 yrs SRT/$100 SA
**COUNTS 16 - 18:**         5 yrs/$250,000/3 yrs SRT/$100 SA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 15-00088 |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN PATRICK COUCH, M.D. and, | ) | |
| XIULU RUAN, M.D. | ) | |
| | ) | |

## <u>NOTICE TO THE COURT</u>

Comes now the United States of America, by and through Kenyen R. Brown, the United States Attorney for the Southern District of Alabama, and Assistant United States Attorney Deborah A. Griffin, and in accordance with Criminal L.R. 7. provides the following brief statement describing the differences between the superseding and the second superseding charges:

1.     Counts Three and Four are new, as are Counts Eight through Fourteen. Counts Seventeen and Eighteen are also news.

Respectfully submitted this the 28th day of April, 2016.

KENYEN R. BROWN
UNITED STATES ATTORNEY
by:

*/s/ Deborah A. Griffin*
Deborah A. Griffin (GRIFD9200)
Assistant United States Attorney
63 S. Royal Street, Suite 600
Mobile, Alabama 36602
Telephone: (251) 441-5845